**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 4 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DANNY FLORES,

      Defendant-Appellant.

No. 96-1152

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 95-CR-34-1)**

Andrew A. Vogt, Assistant United States Attorney, Denver, Colorado (Henry L. Solano, United States Attorney, with him on the briefs) for Plaintiff-Appellee.

Stephen M. Wheeler, Evergreen, Colorado, for Defendant-Appellant.

Before **BRORBY, EBEL** and **KELLY**, Circuit Judges.

**EBEL**, Circuit Judge.

      Danny Flores was convicted of conspiracy to distribute, and possession with intent to distribute, methamphetamine. The district court enhanced his sentence for being a manager or supervisor of a criminal activity and for possessing a firearm during the course of a crime. Flores appeals the district

court's refusal to dismiss his conspiracy charge, the district court's evidentiary rulings, and the district court's enhancement of his sentence.  We affirm.

## BACKGROUND

Flores' arrest and conviction stem from his involvement in a methamphetamine distribution ring operating out of Colorado Springs, Colorado, from early 1994 through January 1995.  Flores' involvement with the ring became known to the Government on December 5, 1994.  On that date, an undercover federal agent, Scot Thomasson ("Agent Thomasson") arranged to meet with the alleged leader of the ring, James Maass ("Maass"), to purchase a large quantity of methamphetamine.  They met that night in the lighted parking lot of the Penny Arcade in Manitou Springs.  Although Agent Thomasson expected to meet only with Maass, two additional individuals, previously unknown to Agent Thomasson, were present and waiting.  One of these individuals approached Agent Thomasson and Maass, and expressed concerns to Maass about the safety of dealing with Thomasson.  After Maass showed the individual the money that Agent Thomasson had given him for the drugs and convinced him that Agent Thomasson was safe, the individual entered Maass' car, where he proceeded to conduct a methamphetamine transaction with Maass.  Maass then sold the drugs to Agent Thomasson.

Agent Thomasson had been told by Maass that a local street gang known as "the Banditos" was a supplier of methamphetamine for Maass' distribution ring. Subsequent to the transaction at the Penny Arcade, Agent Thomasson learned that local police detectives had interviewed and photographed a number of the members of the Banditos during the course of an unrelated investigation. Agent Thomasson met with one of the detectives, who began laying out a stack of nine photos of Banditos members on a desk. Immediately upon viewing Flores' photo, Agent Thomasson identified him as the first unidentified individual he had encountered at the Penny Arcade transaction. Agent Thomasson apparently did not identify the second individual from the photos shown him.

A warrant was issued for Flores' arrest. Officers found Flores at home in his kitchen, standing approximately two feet away from his refrigerator. After handcuffing Flores, officers found a loaded firearm on top of the refrigerator. Officers conducted a protective sweep of the house for other individuals who might pose a danger. Officers noticed a loaded shotgun on the headboard of Flores' bed. They entered the bedroom to secure the gun. As officers secured the shotgun, they noticed a plastic bag containing a substance appearing to be methamphetamine in a small glass-doored compartment in the headboard. Also, on the windowsill in the bedroom, officers found a small amount of a substance that police suspected to be methamphetamine, along with assorted drug

- 3 -

paraphernalia. Officers obtained a warrant to search the headboard compartment. Subsequent laboratory tests showed that the substances found on the windowsill and in the headboard compartment were indeed methamphetamine, totaling 13.8 grams.

Flores was charged with various federal crimes, including conspiracy to distribute more than 100 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii); distribution and possession with intent to distribute methamphetamine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii), and (b)(1)(C); and using and carrying a firearm in relation to drug trafficking, in violation of 18 U.S.C. § 924(c). He was tried in federal district court along with co-defendants Maass, Jason Haley, and Shannon McKane. Before trial, Flores' filed motions seeking dismissal of the conspiracy count, suppression of the evidence found in his home, and suppression of the federal agent's in-court identification, all of which were denied. At the close of the government's evidence, Flores' motion for judgment of acquittal was denied, but then reconsidered the following day in light of the Supreme Court's announcement of its decision in Bailey v. United States, 516 U.S. 137 (1995). Relying on Bailey, the district court dismissed the charge of carrying a firearm in relation to drug trafficking against Flores. At the conclusion of trial, Flores was found guilty on all remaining counts.

At sentencing, the district court enhanced Flores' base offense level of 32 by a total of five points: three points for being a supervisor/manager of a criminal enterprise, and two for possessing firearms in connection with the crime. Flores' criminal history category was set at II because of two prior state convictions. Flores was sentenced to 20 years imprisonment, followed by five years of supervised release.

## I. Conspiracy

Flores first argues that because he was a mere supplier of the drug to Maass' methamphetamine distribution ring, and that insufficient evidence was presented to show that he was a member of the ring, the district court erred in not dismissing the conspiracy charge against him. This court reviews a district court's decision not to dismiss a charge for abuse of discretion. See United States v. Kingston, 971 F.2d 481, 490 (10th Cir. 1992). We review claims of insufficiency of the evidence by "review[ing] the record de novo and ask[ing] only whether, taking the evidence -- both direct and circumstantial, together with the reasonable inferences to be drawn therefrom -- in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir. 1996) (quotations and citations omitted).

In order to obtain a conspiracy conviction "the government must show

[1] that two or more persons agreed to violate the law, [2] that the Defendant knew at least the essential objectives of the conspiracy, . . . [3] that the Defendant knowingly and voluntarily became a part of it, and [4] that the alleged coconspirators were interdependent." United States v. Ivy, 83 F.3d 1266, 1285 (10th Cir. 1996) (internal quotations and citations omitted).

The evidence presented at trial was more than sufficient to meet the requirements of Ivy. In addition to Agent Thomasson's testimony that Flores supplied the drugs for the Penny Arcade transaction and questioned Maass as to the safety of dealing with Agent Thomasson, there was evidence presented at trial that Flores on other occasions delivered drugs to other members of the conspiracy and acted as an intermediary between the Maass ring and the Banditos to help settle a dispute between members of the two groups. These actions are sufficient to qualify Flores as a member of the Maass methamphetamine distribution conspiracy. See Ivy, 83 F.3d at 1286 (holding that evidence that low-level dealer purchased cocaine from members of a cocaine distribution organization, exhibited ties to the organization, and gave advice to its members was "more than enough to link" the dealer to the conspiracy).

Flores argues that he cannot be held to be a member of the Maass conspiracy because his relationship with Maass was merely that of buyer-seller. For this proposition Flores relies upon this court's decisions in United States v.

Fox, 902 F.2d 1508, 1514 (10th Cir. 1990), and United States v. McIntyre, 836 F.2d 467, 471 (10th Cir. 1987). In those cases we held that the buyer in a retail drug transaction cannot, as a general rule, be deemed part of the larger conspiracy that brought him the drug. See Fox, 902 F.2d at 1514 ("One who merely purchases drugs or other property from a conspirator does not thereby become a member of the conspiracy."); McIntyre, 836 F.2d at 471 ("[P]roof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy . . . .") (further quotation and citation omitted). However, "the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy." Ivy, 83 F.3d at 1285-86. Flores was not a street-level retail drug *purchaser*, he was a wholesale *seller* who knowingly helped supply large quantities of methamphetamine to a distribution organization, an organization that in turn relied in great part upon Flores' efforts for its success. The retail buyer rule simply does not apply to Flores. Based on the evidence adduced at trial, a reasonable jury easily could have found that Flores was a willing member of the distribution conspiracy.

## II. Search and Seizure of Evidence

Flores next argues that the court erred in refusing to suppress the methamphetamine seized from the cabinet in the headboard of his bed. Flores claims that this evidence was located behind a closed door in a small cabinet space, much too narrow to conceal a person, thus it was illegally found as the result of an impermissible search that fell outside the scope of the protective sweep.

We review the reasonableness of a search and seizure de novo. See United States v. Lugo, 978 F.2d 631, 634 (10th Cir. 1992). However, we review a trial court's factual findings with regards to a search and seizure for clear error, see id., viewing the evidence in the light most favorable to the Government in an appeal from the denial of a motion to suppress. See United States v. Janus Industries, 48 F.3d 1548, 1552 (10th Cir. 1995).

It is well established that officers conducting an arrest of an individual in a dwelling may conduct a warrantless protective search of that dwelling when they have a reasonable suspicion that "the house is harboring a person posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 336 (1990). The protective sweep "may extend only to a cursory inspection of those spaces where a person may be found." Id. at 335. A warrantless search does not violate the Fourth Amendment so long as "the exigencies of the situation make that course

imperative." United States v. Franco, 981 F.2d 470, 472 (10th Cir. 1992) (internal quotations and citations omitted). However, if police officers conducting a proper protective sweep of a dwelling come across evidence of criminal activity in plain view they may seize it, so long as that evidence is such that a reasonable police officer would conclude, based on experience and the circumstances, that the item is probably incriminating. See United States v. Tisdale, 921 F.2d 1095, 1097 (10th Cir. 1990); see also Coolidge v. New Hampshire, 403 U.S. 443, 464-71 (1971); Janus Industries, 48 F.3d at 1554-55.

Flores does not contest the propriety of the protective sweep of his home. Instead, he argues that the compartment in the headboard of his waterbed where officers found a bag of methamphetamine was too small to conceal a person, thus police must have illegally opened and searched the compartment during the course of their protective sweep. Key to this argument is Flores' contention that items behind the etched glass door in question cannot readily be seen, and that the only way to view the contents therein is to open the door.

At the suppression hearing, Flores' wife testified that items cannot be readily seen behind the glass door in question. However, officers testified that the bag was in plain view through the glass, that its illegal character was immediately evident to the experienced officers conducting the search, and that they did not open the door until they had received a search warrant. After

considering all the evidence offered by both sides, including witness testimony and photographs of the glass compartment door taken by Flores' wife, the district court made a finding of fact that the glass door was transparent and found that because the officers conducting a proper protective sweep had a plain view of the bag of methamphetamine through the glass door, they legally could have seized it at that point, even without the added precaution of a search warrant. Because the court's factual findings that the glass door was transparent and that the drugs inside the compartment were in plain view were not clearly erroneous, the court's decision not to suppress the admission of this evidence is affirmed.

### III. Identification

Flores next argues that because Agent Thomasson initially identified him as the result of an unnecessarily suggestive photo line-up, his in-court identification of Flores should have been disallowed by the court. Flores argues that the photo line-up used to identify him was unnecessarily suggestive because (1) the photos were shown to Agent Thomasson one-by-one, not in a single layout display; (2) although all of the photos shown to the agent were of young Hispanic men, in his photograph the eyes are very distinctive from the other photographs; and (3) his is the only photo of a man with a goatee. We conclude that there was nothing unlawful about the procedure whereby Agent Thomasson identified Flores.

The constitutionality of an identification procedure is decided by the reviewing court de novo. See U.S. v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995). Factual findings of the trial court are reviewed for clear error. See id. When the police employ a photo line-up for identification purposes, the procedure must not be "unnecessarily suggestive." Grubbs v. Hannigan, 982 F.2d 1483, 1489-90 (10th Cir. 1993). This court has held that a photo array containing only six pictures, among which the defendant's photo was the only one of a person with his eyes closed, was not unnecessarily suggestive. See United States v. Sanchez, 24 F.3d 1259, 1263 (10th Cir. 1994). Even if a photo line-up is unnecessarily suggestive, it will not invalidate a subsequent in-court identification unless the line-up is so unnecessarily suggestive that it overwhelmed the other indicia of reliability that might validate the in-court identification. See Grubbs, 982 F.2d at 1490. Indeed, a photo array consisting of only one photo may be acceptable if the witness has had a clear opportunity to positively identify the suspect prior to the array, the witness expresses a great deal of certainty with regard to the identification, and the circumstances of the identification show a lack of coercive pressure on the identifying witness to make an identification from that photo. See Manson v. Brathwaite, 432 U.S. 98, 114-16 (1977); see also 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 7.4(e) (1984). The ultimate test is whether the suggestive line-up created a "very substantial likelihood of

irreparable misidentification." Manson, 432 U.S. at 116 (quotation and citation omitted).

We find that the photo array in this case was not unnecessarily suggestive. The nine photographs were all of Hispanic males of roughly similar build, height, age, and hairstyles. Further, the officer providing Agent Thomasson with the file of photographs had no idea who Agent Thomasson might be looking for, outside the fact that the suspect might be a member of the Banditos gang. Thus, there was no risk that these pictures were assembled to direct Agent Thomasson's attention toward any one particular individual. The fears expressed by Justice Marshall in his dissent in Manson regarding the polluting of a witness' identification by biased police officials who prepare and present photo line-ups are not implicated in this case. See Manson, 432 U.S. at 132-34 (Marshall, J., dissenting). Moreover, Agent Thomasson did not identify the second individual at the transaction from the photos shown him, suggesting that he was under no pressure to make an identification from those particular photographs.

Furthermore, this array of pictures did not generate a substantial likelihood of irreparable misidentification during the subsequent in-court identification. Agent Thomasson had a clear view of Flores during the transaction at the Penny Arcade, and plenty of time to observe Flores' features. Agent Thomasson identified Flores from his photo immediately, without any prompting from the

detective. Absent any indicia that Agent Thomassons' identification of Flores was unduly influenced by the detective showing him the photos in his possession, we cannot say that there was a very substantial likelihood of irreparable misidentification of Flores by Agent Thomasson. The district court did not err in refusing to suppress Agent Thomassons' in-court identification.

### IV. Sentencing

Finally, Flores challenges the court's determination of his sentence under the United States Sentencing Guidelines. We review the district court's interpretation and application of the Sentencing Guidelines de novo and its factual findings for clear error. See United States v. Pappert, 112 F.3d 1073, 1078 (10th Cir. 1997). Flores asserts that because he was a mere supplier of methamphetamine to the Maass ring, and did not exert direct control over any subordinates in that ring, the district court erred in assessing him three levels for being a manager or supervisor of a criminal activity, pursuant to U.S.S.G. § 3B1.1(b). We note that the district court explicitly rejected the Government's request that Flores' sentence be enhanced by four levels for being an organizer or leader, but accepted the Presentence Report's suggestion that Flores qualified as a manager or supervisor of the Maass distribution ring.

Evidence before the district court indicated that Flores exerted control over the supply and price of the methamphetamine flowing from the Banditos to the Maass ring. He personally delivered quantities of methamphetamine to members of the conspiracy. On at least one occasion, Flores acted as a dispute mediator between members of the Maass ring and members of the Banditos. In short, the court specifically found Flores was "if not the supplier, certainly the principal supplier" for the organization, who set the price of the methamphetamine that flowed from the Banditos to the Maass ring. In the district court's words, "[w]ithout Flores and the Banditos Maass had no supply, and without a supply Maass had no customers, and without customers he had no organization." The district court did not clearly err in its factual findings that Flores exerted control over the Maass organization and members of the organization. Thus, enhancement of Flores' sentence under § 3B1.1(b) was appropriate.

Flores also appeals the district court's two-level enhancement for his possession of a dangerous weapon in connection with a drug crime under U.S.S.G. § 2D1.1(b)(1). Flores argues that because the evidence was insufficient to show that the guns found in his home had any connection to his drug dealing, the district court's enhancement was improper.[1] We disagree.

---

[1] Flores also argues that the district court's enhancement for possessing a weapon in connection with a crime was in error because the Supreme Court's

(continued...)

- 14 -

"[T]he government bears the burden of proving by a preponderance of the evidence that the gun was proximate to the drug offense." United States v. Lang, 81 F.3d 955, 964 (10th Cir. 1996). Possession of a weapon in connection with a drug trafficking offense "is established if the government proves by a preponderance of the evidence that a temporal and spacial relation existed between the weapon, the drug trafficking activity, and the defendant." United States v. Roederer, 11 F.3d 973, 982 (10th Cir. 1993) (internal quotation and citation omitted). This nexus may be established by showing that the weapon was located nearby the general location "where drugs or drug paraphernalia are stored or where part of the transaction occurred." Id. at 983 (citation omitted). Once the government establishes that the gun was possessed in proximity to the drugs or transaction, the burden shifts to the defendant to "show it is clearly improbable that the weapon was related to the offense." United States v. Robertson, 45 F.3d 1423, 1449 (10th Cir. 1995) (internal quotation and citation omitted).

---

[1](...continued)
ruling in Bailey v. United States, 516 U.S. 137 (1995), modified the Sentencing Guidelines as they apply to the interaction between firearms and crimes. This argument is utterly without merit. Bailey modified only the interpretation and application of the term "use" as applied to firearms. See United States v. Hallum, 103 F.3d 87, 89 (10th Cir. 1996). Because Flores's sentence was enhanced for *possessing* a dangerous weapon in connection with a crime, his Bailey argument fails.

- 15 -

Flores does not dispute that a loaded shotgun was found in close proximity to a large quantity of drugs stored in the headboard of his bed. Instead, he relies upon this court's unpublished decision in United States v. King, 1996 WL 470321(10th Cir. Aug. 20, 1996), for the proposition that because the government failed to prove that any drug transactions occurred at his home, it thereby failed to prove a nexus between the weapon and his crime of drug distribution. In King this court held that a § 2D1.1(b)(1) enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id. at *2 (quoting U.S.S.G. § 2D1.1(b)(1), cmt. (n.3)). This statement is simply a reiteration of the Robertson rule: once the Government proves that a weapon was found in near proximity to a distributable quantity of illegal drugs, the burden shifts to the defendant to prove that it was highly unlikely that the weapon had anything to do with the drug offense. As this court has previously noted, enhancement under § 2D1.1(b)(1) is designed to reflect the increased danger of violence when drug traffickers add firearms to the mix. See United States v. Contreras, 59 F.3d 1038, 1040 (10th Cir. 1995). Although in many cases the weapon will be involved with some sort of illegal transaction, it is not necessary for the Government to show that drugs and money changed hands near the weapon; the weapon may simply serve as a potentially deadly means of protecting the trafficker's goods, thereby increasing the danger of violence.

- 16 -

In this case, Flores was convicted of possession with intent to distribute as well as actual distribution of methamphetamine. Because Flores failed to show that it was clearly improbable that the shotgun on his headboard had any relation to his possession and control of the large quantity of methamphetamine contained within, he failed to meet his burden of proof under Robertson . The district court did not err in enhancing his offense level under § 2D1.1(b)(1).

Finally, Flores argues that the court improperly increased his criminal history score by one point under U.S.S.G. § 4A1.1(c), resulting in criminal history category II, based upon his July 7, 1995 state conviction of possession of marijuana. [2] Flores argues that because the state court decided to continue his marijuana possession sentence and have it run concurrently with whatever sentence he would receive for the federal conviction in this case, and because the Banditos were also selling marijuana, his possession of marijuana was conduct that was part of the instant offense and thus should not be counted as a "prior sentence" under § 4A1.1.

According to U.S.S.G. § 4A1.1, the sentencing court is to increase the points used to calculate the defendant's criminal category for his prior sentences.

_____

[2] Flores does not contest the court's other one-point increase for a May, 1994, state conviction for possession of a controlled substance: drug paraphernalia.

- 17 -

A "prior sentence" is defined as "any sentence previously imposed upon adjudication of guilt . . . for conduct not a part of the instant offense." U.S.S.G. § 4A1.2(a)(1) (1995). Conduct that is "part of the instant offense" is in turn defined under § 1B1.3 as "relevant conduct." See U.S.S.G. § 4A1.2, cmt.1. Under § 1B1.3, the definition of "relevant conduct" further depends upon whether the conduct that the defendant seeks to have combined is subject to grouping under § 3D1.2(d). See U.S.S.G. § 1B1.3(a)(2); United States v. Cuthbertson, 138 F.3d 1325, 1327 (10th Cir. 1998). Conduct that is groupable under § 3D1.2(d) is "relevant conduct" if it constitutes an act or omission that was "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). If the conduct at issue is not groupable under § 3D1.2(d), then it qualifies as "relevant conduct" only if it "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1); see Cuthbertson, 138 F.3d at 1327.

Although Flores was charged in state court with one count of possession of marijuana with intent to distribute, and one count of possession of more than eight ounces of marijuana, he plead guilty to and was convicted only of the possession count. Possession of a controlled substance is governed by § 2D2.1 of the Guidelines; § 2D2.1 is specifically excluded from grouping under U.S.S.G.

§ 3D1.2(d). Thus Flores' state marijuana possession conviction can be deemed to be "part of" his federal conviction for conspiracy to distribute methamphetamine only if his marijuana possession "occurred during the commission of" the instant crime of possession with intent to distribute and conspiracy to distribute methamphetamine. [3] Cuthbertson , 138 F.3d at 1327 (quotations and citations omitted).

We first note that Flores was arrested in connection with his state conviction for possession of marijuana on November 17, 1994, whereas the Penny Arcade methamphetamine transaction involved in the instant federal charge occurred on December 5, 1994, and defendant was arrested for the federal methamphetamine-related offenses on January 10, 1995. It is not obvious how the mere possession of marijuana is in any way relevant to Flores' conviction of conspiring to distribute methamphetamine to a wide consumer base. Distinct offenses that did not occur contemporaneously and do not represent essentially one composite harm cannot be said to have occurred during the commission of one another. Because the conduct underlying Flores' possession of marijuana conviction is "readily broken into [a] discrete identifiable unit[]" separate from

---

[3] It goes without saying that possession of marijuana cannot be argued to be an act committed "in preparation for" or "in the course of attempting to avoid detection or responsibility for" the offense of possession with intent to distribute and conspiracy to distribute methamphetamine.

the conduct underlying his methamphetamine distribution activities, Flores'

marijuana possession did not occur "during the commission of" and thus was not

"related to" his conviction for conspiracy to distribute and possession with intent

to distribute methamphetamine.      Id. (quotations and citations omitted).  That the

state court chose to put off Flores' sentence until after his federal trial, and that

his street gang was also involved in the sale of marijuana are not determinative.

See U.S.S.G. § 4A1.2(a)(4).  The district court did not err in treating Flores' state

conviction for possession of marijuana as a prior sentence under § 4A1.1(c).      [4]

## CONCLUSION

For the reasons stated above, the district court's denial of Flores' motion to

dismiss the conspiracy charge is AFFIRMED; the district court's denial of Flores'

motion to suppress evidence seized is AFFIRMED; the district court's refusal to

suppress Agent Thomasson's in-court identification is AFFIRMED, and the

---

[4] Although at the sentencing hearing the district court did not discuss the question of Flores' prior conviction for possession of marijuana, it did specifically incorporate the Government's presentence report into its findings. Because the presentence report recommended that the court enhance Flores' criminal history category to II based in part upon Flores' prior conviction for possession of marijuana at issue on appeal, we can assume that this prior conviction was incorporated into the court's final decision and calculation of Flores' criminal history category.

district court's calculations of Flores' offense level and criminal history category are all AFFIRMED.