UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-3513
_____

UNITED STATES OF AMERICA

v.

JEROME LAMONT KELLY,

Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

(D.C. Crim. Action No. 2-08-cr-00374-012)
District Judge: Honorable Joy Flowers Conti

_____

SUR PETITION FOR REHEARING
_____

Present: McKEE, <u>Chief</u> Judge, AMBRO, FUENTES,
SMITH, FISHER, CHAGARES, JORDAN, HARDIMAN,
GREENAWAY, JR., VANASKIE, SHWARTZ, KRAUSE,
RESTREPO, SCIRICA and ROTH,[1] <u>Circuit</u> <u>Judges</u>

The petition for rehearing filed by Appellant in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the judges of the circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the Court en banc, is denied.

_____

[1] The votes of Judge Scirica and Judge Roth are limited to panel rehearing only.

BY THE COURT,

s/Joseph A. Greenaway, Jr.
Circuit Judge

Dated:     May 26, 2016

SLC/cc:    Donovan J. Cocas, Esq.

           Robert Epstein, Esq.

           Rebecca R. Haywood, Esq.

           Michael L. Ivory, Esq.

**No. 13-3513** *UNITED STATES v. JEROME LAMONT KELLY*

**OPINION DISSENTING SUR DENIAL OF PETITION FOR REHEARING EN BANC**

McKEE, Chief Judge, with whom AMBRO, SMITH and RESTREPO, Circuit Judges, join.

I appreciate that the panel's decision in this case was dictated by circuit precedent and that my colleagues therefore felt compelled to affirm the jury's determination that Kelly's membership in the Alford drug distribution conspiracy had been proven beyond a reasonable doubt. However, I take the unusual step of filing this opinion sur denial of rehearing to explain why we have made a mistake by not availing ourselves of this opportunity to reexamine our jury instructions in drug conspiracies. I do so even though this appeal has been resolved in a non-precedential opinion because our current approach to informing jurors how to distinguish between a purchaser from a drug conspiracy and a member of that conspiracy is so meaningless that it presents the illusion of an objective standard while furnishing no guidance to jurors who must make this crucial distinction.

Our current standard for channeling a jury's inquiry in such prosecutions fails to provide a jury with sufficient guidance to allow jurors to appropriately differentiate between customers and co-conspirators. Although some of our factors may be relevant to this inquiry, the irrelevant factors I discuss below create the very real danger of placing a thumb on the conspiratorial side of the scale and thereby tipping the balance in favor of a conviction for conspiracy when only a buyer-seller relationship has been established. Because there is no way of knowing how this jury would have viewed the circumstantial evidence against Kelly if that

3

additional weight had not been added to the conspiratorial side of the scale, I believe this case "involves a question of exceptional importance," meriting en banc reconsideration. Fed. R. App. P. 35(a).

# I.

In order to establish that a purchaser of illegal drugs is a member of the conspiracy that is selling them, the Government must generally prove beyond a reasonable doubt: "(1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal, which [the defendant] knowingly joined." *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010). Although proof of membership in a conspiracy can certainly be satisfied by circumstantial evidence, circumstances that merely establish "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, [are] insufficient to establish that the buyer was a member of the seller's conspiracy." *United States v. Perez*, 280 F.3d 318, 343 (3d Cir. 2002) (quoting *United States v. Gibbs*, 190 F.3d 188, 198 (3d Cir. 1999)). Accordingly, our current jury instructions give undue weight to the fact that one has purchased from someone who is a member of a conspiracy, and they fail to provide the analytical compass that would help jurors place such purchases in their proper context.

In *United States v. Gibbs* we note several factors relevant to determining whether an alleged co-conspirator "has knowledge of the conspiracy to the extent that his drug purchases are circumstantial evidence of his intent to join that conspiracy." *Gibbs*, 190 F.3d at 199. These include "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and whether there is a demonstrated level of mutual trust." *Id.* (citing *United States v. Hach*, 162 F.3d 937, 943 (7th Cir. 1998)). An additional factor provided in *Gibbs* is "whether the buyer's transactions involved large amounts of drugs." *Id.* (citing *United States v. Flores,* 149 F.3d 1272, 1277 (10th Cir. 1998); *United States v. Kozinski,* 16 F.3d 795, 808 (7th Cir. 1994)). In writing the opinion in *Gibbs,* Judge Becker

4

took pains to point out the problems with the standard that we were using to differentiate between mere purchasers of drugs from a drug conspiracy and members of that conspiracy. He explained in a footnote:

> Judge Becker believes that a buyer's knowledge that he is buying drugs from someone involved in a larger conspiracy does not lead directly to the inference that the buyer intended to join that conspiracy and achieve a common goal with its conspirators. He urges a course correction under which this precept would be abandoned in favor of the approach to buyer-seller relationships in the conspiracy context taken by the Seventh Circuit Court in an important opinion by Judge Flaum. *See United States v. Townsend*, 924 F.3d 1385 (7th Cir. 1991).

*Gibbs*, 190 F.3d at 198 n.3. Judge Becker then goes on to explain why the *Townsend* analysis provides more substantive and meaningful guidance to jurors than the approach we continue to take.

This case illustrates why our current jurisprudence creates little more than an illusory distinction between buyers and co-conspirators and thereby creates the very real risk that the co-conspiratorial net will be cast over those who merely purchase from a drug conspiracy. Indeed, this case represents a quintessential example of this problem.

**II**.

Kelly made more than one purchase from the Alford conspiracy for personal use, and he also resold some of the drugs that he purchased. However, although there were over 60,000 recorded conversations with the leader of the

5

conspiracy, Kelly appears on the underwhelming sum of seven of them, and there is no evidence that any of these conversations tied Kelly into doing anything other than buying from Alford (and getting information about how to convert the purchased product to crack cocaine). In addition, to the extent that the testifying co-conspirators in this case knew Kelly, none named him as a member of the conspiracy. Rather, the Government's own witnesses said Kelly was merely a customer, or a "lick." *See* J.A. at 1240, 1242. He did not advance funds to the members of the conspiracy or have any financial interest or stake in the conspiracy, nor is there any evidence that he was involved in its operations and objectives in any way beyond his purchases.

In affirming his conviction for conspiracy, my colleagues are partially persuaded by the phone records in which Kelly and Alford discussed third parties in a way that would enable a rational jury to conclude that Kelly was aware of Alford's transactions with drug suppliers and, by extension, of Alford's role within a larger operation. However, as Judge Becker noted in *Gibbs*, a buyer's knowledge of the larger conspiracy "does not lead directly to the inference that the buyer intended to join that conspiracy and achieve a common goal with its conspirators." *Gibbs*, 190 F.3d at 198 n.3. The Government attempts to explain away this evidentiary void by claiming that this is only relevant where the existence of the larger conspiracy itself is in question. *See* Gov't Response at 5 (quoting *United States v. Pressler*, 256 F.3d 144 (3d Cir. 2001)). The Government's rejoinder based on *Pressler* is neither persuasive nor helpful. In *Pressler,* we held that the evidence was insufficient to establish that the defendant (Shreffler) was a co-conspirator as opposed to a mere purchaser. We explained:

> The Government demonstrated that the main person from whom Shreffler obtained his heroin, . . . Caban, also distributed the drug to many others, and that some of the people to whom Caban sold heroin had been referred to him by Shreffler. The evidence also established that many of the

6

> people to whom Shreffler and Caban provided heroin sold the drug themselves, including a man with whom Shreffler lived for several months. And the Government proved that Shreffler was aware of all of the above facts.

256 F.3d at 147. That evidence is more suggestive of a conspiratorial relationship than the evidence that purports to tie Kelly to the Alford conspiracy here. Yet, we held the evidence was insufficient to establish a conspiratorial relationship between Shreffler and Caban. "[T]here was simply no evidence that Shreffler ever agreed to work with either his seller or his buyers to achieve a common goal or advance a common interest." *Id.* There is also no evidence that Kelly ever agreed to work with Alford to achieve a common goal or advance a common interest.

The Government's attempt to limit the force of *Gibbs* and to distinguish *Pressler* by suggesting that the concern expressed by Judge Becker in *Gibbs* is only relevant where the existence of a conspiracy is in question is simply wrong. *Pressler* did distinguish *Gibbs* by explaining that "[i]n *Gibbs* there was no question that a cocaine distribution ring headed by . . . Gibbs . . . existed; the dispute was whether [a purchaser of large amounts of heroin from Gibbs] had agreed to join the conspiracy." 256 F.3d at 151. Although that distinction was helpful to the analysis in *Pressler*, when viewed in its proper context, it is a distinction without any analytical difference here. Rather, the language the Government relies upon merely established that where a conspiracy is shown to exist, and the conspiratorial "gang has divided the neighborhood into zones in which only a single dealer may operate, then the fact that the defendant consistently sells . . . drugs [in a zone controlled by the conspiracy] would provide evidence that the defendant both knew of the existence of the conspiracy and was a participant in it." *Id.* That is simply not the situation here. There is not even a suggestion that Kelly resold drugs in an area exclusively controlled by the Alford conspiracy, and the Government has not argued to the contrary. That was also

7

not the situation in *Pressler* where we held that the evidence was not sufficient to establish that a purchaser was a co-conspirator.

Nevertheless, relying upon the factors we have previously endorsed, the District Court determined that the circumstantial evidence, viewed "in the light most favorable to the government, supports the 'reasonable and logical inference' that Kelly's interactions with the members of the Alford conspiracy 'could not have been carried on except as the result of a preconceived scheme or common understanding'" such that "[a] reasonable jury could have concluded beyond a reasonable doubt that Kelly knew he was dealing with a larger drug operation when he purchased cocaine . . . , that he shared the Alford conspiracy's goal of selling cocaine and crack cocaine for profit, and that he worked with members of the Alford conspiracy to achieve that goal." J.A. at 40 (quoting *Gibbs*, 190 F.3d at 197). Yet, it is highly likely that, had the jury been afforded a meaningful metric to assess this evidence, it would have concluded that the Government had failed to prove that Kelly was anything more than a mere purchaser of drugs and that he ever intended to join the Alford drug conspiracy or advance its criminal objectives.

As Judge Becker argued in *Gibbs*, knowledge of a larger conspiracy can easily be attributed to anyone who purchases illegal drugs from a cocaine distribution ring. Everyone who purchases cocaine in the United States should understand that the seller is but one link in a larger supply chain because the coca leaves that are necessary to produce cocaine are not grown in the United States. Thus, one who buys cocaine knows that his seller is part of a larger network. Yet, no fair system of jurisprudence should allow that knowledge to be considered as circumstantial evidence that the purchaser thereby intended to join the distribution network or to advance its illegal objectives. That remains true even if the purchaser then resells any of those drugs, absent proof of some arrangement with the original seller or his agent that would establish more than a buyer-seller relationship (such as selling in a neighborhood that is under the exclusive control of the initial seller's organization).

8

Here, the panel's analysis to the contrary ignores the fact that a college student who purchases a quantity of cocaine and resells some of it to his/her roommate knows that the cocaine almost certainly came from out of the Country. Because the purchase money obviously furthers the purpose of a drug cartel (i.e., profiting from the sale of illegal drugs), the purchase money contributes to the common illegal goal and an agreement can certainly be inferred to "work toward that goal." NPO at 3. However, that is not the least bit helpful in separating mere purchasers from those who agree (however tacitly) to advance the conspiratorial entity.

It is for this reason that Judge Becker recommended in *Gibbs* that we follow the Seventh Circuit's approach to buyer-seller relationships in the context of drug conspiracies rather than instructing a jury to consider whether a buyer had knowledge of the larger conspiracy. We should ask instead "whether the buyer can be said to have a stake in the larger conspiracy." *Id.* In other words, in order to hold a defendant liable as a member of the larger conspiracy, the Government should have to prove that the defendant actually intended to join the larger organization and advance its objectives and goals. Judge Becker believed that this framework, "which may often render a buyer a conspirator with his seller but not with the larger conspiracy, is more consistent with both the precepts of agency law (which undergirds conspiracy law) and with reality." *Id.* I agree, and it is past the time that we should have adopted something analogous to the Seventh Circuit's buyer-seller relationship inquiry, also adopted by the Second Circuit, which would examine whether the buyer has a stake in the larger conspiracy. *See United States v. Clay*, 37 F.3d 338, 341 (7th Cir. 1994); *United States v. Brock,* 789 F.3d 60, 65 (2d Cir. 2015) ("[A] good customer—even a very good customer—of a drug organization may still be just a customer, not a co-conspirator, if the evidence cannot support an inference of mutual dependency or a common stake.").

I realize, of course, that "[d]etermining whether someone has 'a stake in the venture' is easier said than done—especially [when limited to] circumstantial evidence." *United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013). Accordingly, the Seventh Circuit has recently reevaluated the factors it uses to analyze a buyer's "stake" in a seller's larger

9

conspiracy, recognizing that most of the previously accepted factors "d[o] not actually distinguish conspiracies from buyer-seller relationships." *Brown*, 726 F.3d at 999. Circumstances such as "frequency, regularity and standardization," for example, can just as well apply to someone buying "two sticks of deodorant for $3.49 each, every other Friday" at Walmart. *Id.*

Similarly, everyone engaged in the buying and selling of illegal contraband will necessarily exhibit "mutual trust," the same as co-conspirators, "because either buyer or seller might be a government informant or turn violent." *United States v. Colon*, 549 F.3d at 565, 569 (2d Cir. 2008). If the seller did not trust the buyer, there would never be a sale. This ever-present trust, even between mere buyers and sellers, should not be a factor in determining whether there is sufficient evidence that the purchaser intended to advance the seller's illegal objectives and thereby join the drug conspiracy.

## III.

No doubt because of the problems of distinguishing purchasers from co-conspirators, the Seventh Circuit has reworked its factors in a manner consistent with these concerns. That Court now focuses more on whether the buyer and seller have stakes in each other's businesses above and beyond a traditional buyer-seller relationship. The Seventh Circuit's non-exhaustive list of factors includes: (1) "sales on credit or consignment," (2) "an agreement to look for other customers," (3) "a payment of commission on sales," (4) "an indication that one party advised the other on the conduct of the other's business," or (5) "an agreement to warn of future threats to each other's business stemming from competitors or law enforcement authorities." *Brown*, 726 F.3d at 999 (quoting *United States v. Johnson*, 592 F.3d 749, 755-56 (7th Cir. 2010)). These factors are a vast improvement over the factors we ask juries to consider. Yet, the Court of Appeals for the Seventh Circuit views this refined list of considerations merely as the "starting point" for a buyer-seller/co-conspirator inquiry. That Court recognizes that the appropriate inquiry must "consider the totality of the circumstances . . ., tak[ing] into account all the evidence

10

surrounding the alleged conspiracy . . . [and] not los[ing] sight of the larger picture—deciding whether the jury reasonably discerned an agreement to further trafficking of drugs." *Id.* at 1001-02.

Two recent cases from the Courts of Appeals for the Seventh and Second Circuits are instructive and should inform our own jurisprudence. In *United States v. Brock*, the defendant James Dickerson purchased crack cocaine from a cooperating conspirator several times each week and resold it in $20 baggies. *Brock*, 789 F.3d at 62. Although the District Court denied Dickerson's Rule 29 motion, finding that he had "knowledge" of the larger conspiracy, the Second Circuit reversed, concluding "the evidence was insufficient to permit any rational juror to infer that Dickerson knowingly joined or participated in the charged conspiracy." *Id.* at 65. The Court was influenced by the fact that the conspirators "never sold crack to Dickerson on credit, and placed no limitations on Dickerson's ability to use or resell the product he purchased," "did not consider Dickerson to be a member of the organization, and did not know or care what Dickerson did with the drugs after he purchased them," as well as the fact that Dickerson never "shared profits," had no "interactions with [the conspirators] other than the transactions that made him a customer," and never "assisted their operation in any capacity." *Id.* at 64.

Similarly, there was no evidence here that Kelly ever bought drugs from Alford on credit or that Alford placed any limitations on Kelly's use of the drugs he purchased, nor is there any evidence that Kelly shared profits or assisted the Alford conspiracy in any way. Moreover, as noted earlier, the Government's own cooperating witnesses testified that Kelly was not a member of the conspiracy in which they were members.

In *United States v. Pulgar*, 789 F.3d 807 (7th Cir. 2015), the Court of Appeals for the Seventh Circuit found that despite evidence of a close friendship between a defendant supplier and purchaser, "[w]ithout evidence of repeated fronting, sales on consignment, provisioning of tools or supplies, warnings of threats to the business, or some other signal that they enjoyed a heightened level of trust indicative

11

of a drug distribution conspiracy, we cannot infer anything nefarious from this friendship." *Id.* at 815-16. Kelly's trial is similarly devoid of evidence of fronting, consignment sales, provisioning of tools or supplies, warnings, or any other evidence of a shared conspiratorial stake between Kelly and Alford.

There is evidence that, in one of the seven out of 60,000 phone calls that were intercepted on Alford's phone where Kelly and Alford spoke, Kelly asked Alford how to process powder cocaine into crack cocaine. Kelly apparently did not know how to "cook" crack and he asked Alford for assistance. *See* J.A. at 585–89, 1249–51. Relying on the factors allowed under *Gibbs,* my colleagues conclude "a rational trier of fact could interpret [this] to demonstrate Kelly's role as a processor and distributor of crack and as a co-conspirator of Alford." NPO at 4. That simply does not follow. Even under the illusory guidance of *Gibbs,* it is difficult to understand why asking a seller of cocaine how to convert it to crack is evidence that the purchaser had entered into a conspiratorial agreement with the seller beyond the sales transaction or that he intended to advance the seller's enterprise. Such evidence only proves that Kelly did not know how to "cook" powder cocaine into crack, and that he assumed his seller, Alford, would be able to tell him how to accomplish that. Conspiracies should be made of sterner stuff than this.

## IV.

Given the extent to which illegal drugs and illegal drug sales continue to devastate and destroy lives and communities, I have no doubt that we will have another opportunity to revisit the factors we use in attempting to distinguish between purchasers and co-conspirators. Regrettably, in the interim we also will no doubt expose numerous purchasers of drugs (even those who purchase merely to "feed" their own addiction) to the exponentially greater penalties that attach to being a member of a drug conspiracy. I therefore take this opportunity to express my concern that we are failing to afford jurors the guidance they need and that the law requires in deciding whether evidence is sufficient to establish guilt beyond a reasonable doubt in

12

cases such as this.  Worse yet, the "guidance" that we do give jurors is not only less than helpful, it is misleading because it can be an open invitation to convict mere purchasers of illegal drugs of the far more serious crime of being a member of a drug conspiracy.  Accordingly, I now echo the concern expressed by Judge Becker a decade and a half ago and explain why we should avail ourselves of this opportunity and grant Kelly's petition for rehearing.